UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 0:21-CR-209 (WMW)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

MITCHELL JAMES OTTINGER,
A/K/A RACHEL MEYER,
A/K/A TAYLOR MALEK,

        Defendant.

**GOVERNMENT'S POSITION WITH
RESPECT TO SENTENCING**

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Miranda E. Dugi, Assistant United States Attorney, hereby submits its memorandum in support of its position with respect to sentencing of defendant Mitchell James Ottinger.

Over the course of at least nine years, Ottinger engaged in a catfishing and sextortion scheme targeting at least 42 victims. Among Ottinger's victims were numerous children he knew from his position of trust as a substitute teacher and in pre/after-school care and summer programming. Ottinger targeted these young boys and others not only to satisfy his appetite for images of the sexual abuse of children, but for the thrill of humiliating his victims. He threatened to disseminate sexually explicit images produced at his behest, and actually did so, including to the victims' friends and family members. Ottinger also targeted adults for the same abuse. Additionally, Ottinger collected child sexual abuse material depicting graphic sexual violence against infants and toddlers. For Ottinger, cruelty was not just a side effect: it was the point.

Ottinger carefully engineered his offense conduct to ensure that children would feel isolated and vulnerable, and would do as he said. His conduct continues to isolate the children and their families today, leaving them afraid to trust people online and in their community, concerned about revealing that they were victimized, and suffering their shame, anger, and frustration alone.

For these reasons and those that follow, the United States requests that the Court impose a sentence of at least 460 months' imprisonment and a lifetime term of supervised release with special conditions.

## I.    Background

### a.  Ottinger's History and Characteristics

Ottinger comes from a much more stable and supportive home than many defendants who come before the Court. Ottinger is the only child of parents who are married, employed, and who own two homes. (PSR ¶ 129). Ottinger reports that his family is close and his parents remain supportive of him. *Id.* He described his upbringing as "pretty normal" and positive. (PSR ¶¶ 130, 132). Ottinger maintained good grades throughout school, obtained a political science undergraduate degree from the University of Minnesota, and was pursuing a master's degree in education from Hamline University at the time of his arrest. (PSR ¶¶ 145-47).

Ottinger's focus on teaching predates his post-graduate studies, was intertwined with his offense conduct. Ottinger's involvement in the school district where he targeted numerous victims appears to have begun by assisting his mother, an elementary school teacher, at least as early as when Ottinger was 17. (PSR ¶ 151). There, Ottinger eventually

became a regular substitute teacher and worked in a pre/after-care and summer program in the district. *Id.* As noted in the PSR, Ottinger's "only history of employment involves positions" in the school district. *Id.* Again, Ottinger's parents appear to have been supportive of Ottinger's chosen career, citing his "natural talent for teaching (both minors and adults)." *Id.*

Multiple victims from the school district where Ottinger worked have described Ottinger and his mother as being fixtures in the school community. Multiple victims' parents described Ottinger's role as well beyond what one might expect of an ordinary substitute teacher or paraprofessional—cultivating and sustaining close relationships with students in the community. At least one victim's parent reflected on Ottinger's extra care to help her child in a subject he was struggling with, noting that at the time she appreciated Ottinger's kindness and creativity in helping her child. In retrospect, she saw he was clearly gathering information that would assist him in exploiting the child.

### b. Ottinger's Offense Conduct

Beginning when he was a juvenile, and continuing for at least nine years, Ottinger "catfished" minor boys to engage them in sexually explicit conversations and obtain sexually explicit images and videos from them by impersonating minor girls. Ottinger, now 25, victimized approximately 23 identified minor victims, 10 to 12 unidentified suspected minor victims, and seven adult victims. Efforts to identify Ottinger's victims remain ongoing. Additionally, the evidence reflects that Ottinger used false personae and an internet-based application to contact at least 521 unique telephone numbers, including identified child victims. (PSR ¶ 15). Given the scope of Ottinger's criminal conduct, the

3

description of his conduct that follows is far from exhaustive, but rather representative of Ottinger's wide-ranging conduct affecting numerous victims over a matter of years.

Despite (or perhaps because of) their youth, many of Ottinger's victims were quite internet savvy, and took special care to protect themselves online, even as they engaged in sexual activity common amongst teenagers online today. Some victims asked for reassurances of Ottinger's true identity, requesting contemporaneous photos, videos, or chats. Ottinger's records reflect that he researched and used multiple means to provide such reassuring images (e.g., "how to fake your webcam for chat roulette or omegle"). (PSR ¶ 17). For example, even as Victim 1 demonstrated a desire to engaged with and potentially meet "Rachel"—whom Ottinger told Victim 1 was 17 years old—Victim 1 repeatedly expressed skepticism about "Rachel's" true identity, repeatedly asking for verification of how "Rachel" found him on social media, friends in common, and real-time photos to confirm her identity (*e.g.*, "But can you send me and [sic] photo of you holding the number 2 up just so I know this is real" "I'm very nervous" "Your [sic] peer pressuring me" "Bruh this has to be fake no one ever calls me hot").

Nonetheless, Ottinger's twin techniques of enticement and threats often overcame his victims' reticence and safeguards. For example, in the face of Victim 1's apprehensiveness, Ottinger was relentless in his pursuit of sexual images of Victim 1, making numerous requests for sexually explicit material over two days' time in June 2020, ("i wanna see ur abs and dick together" "Just like abs/chest down naked")—repeatedly cajoling, wheedling, and ultimately threatening Victim 1 with exposure if he did not comply. For example, Ottinger dangled the opportunity to meet "Rachel" in person before

4

Victim 1 in order to obtain sexually explicit images of Victim 1.  Once he got them, he

sought more, threatening, *inter alia*:

> Ottinger: Can I show [Victim 1's friend's name] the pics u sent of ur dick
>           Wonder what he'll think
> Victim 1: Tf[1] why would you do that
> . . .
> Ottinger: If u senf [sic] a full[2] like u said I won't show him ig
> . . .
>           If u send by 930 I won't show him then
>           Deal?
> Victim 1: Idk you relies [sic] I'm only 15 and your [sic] blackmailing me to send a
>           dick pic
> Ottinger: Full nude. And I'm 17
> Victim 1: I was going to tonight but now I can't trust you.
> Ottinger: That's a lie
>           Haha send or ig I'll show him
>           So
>           Guess thats a yes

At least one of Ottinger's victims can be seen sobbing in child pornography

produced at Ottinger's direction.  Many remained distraught after Ottinger's conduct was

discovered by law enforcement (e.g., crying and shaking during recorded forensic

interviews with the FBI.).  The ongoing impact of Ottinger's crimes on his victims is

described further below.

Ottinger also catfished and sextorted adult victims who—though older than many

of Ottinger's victims—remain disturbed by the experience.  Ottinger's ruthlessness in

shaming his victims is evident in the messages themselves.  For example, with respect to

one adult victim, J.N., whom Ottinger sextorted in and around December 2019 and January

---

[1] Abbreviation for "the fuck?" as in, "What the fuck?"
[2] Common term for a full-body nude photo.

2020, Ottinger threatened: "Text me or will pay someone to start postng [sic] ur pics up around ur office," and "Gunna post youre [sic] pics on reddit, facebook, and Twitter in 24 hours with your name, the place you work, gf, and more If u don't talk to me."

When one adult victim stated, "Im sorry i cant [sic] speak with you anymore" because he had "a thing going with a gal its not honest," Ottinger responded, *inter alia*, "Guess I'll show ur friends then," and as follows:

> Idc[3]
> Just don't tell her
> We won't fuck but ur my slut you send when I askkk
> Otherwise I'll show ur friends
> If you would have been better about it
> I woild [sic] have let u go but you never just sent without me demanding

Finally, lest Ottinger be tempted to frame his sexual interest in children as focused only teenagers and adults, such a claim runs counter to the evidence in this case. Instead, Ottinger collected child pornography of much younger victims—including depictions of the rape of infants and toddlers—and transferred it between his accounts. (PSR ¶¶ 17, 59-69).

### c.  Charges and Plea

Ottinger was arrested on a criminal complaint on May 4, 2021, and has been detained since that time. (PSR p. F.1; ¶1). On October 4, 2021, he pleaded guilty to a criminal information charging two counts of production and attempted production of child pornography, and one count of interstate threats to extort. (PSR ¶ 2).

---

[3] A common abbreviation for "I don't care."

### d. Psychosexual Evaluation

Ottinger self-commissioned a psychosexual evaluation after his arrest in connection with this case. As of April 4, 2022, Ottinger's attorney, Kurt Glaser, stated that he had not yet received the report. To date, no copy of the psychosexual evaluation has been provided to the government.

### e. Ongoing Victim Impact

Multiple victims and their families have spoken to the FBI and U.S. Attorney's Office about Ottinger's offense conduct. To date, parents of five minor victims and one adult victim have provided impact statements for the Court's consideration, which the United States submits with this sentencing memorandum. More victims and their families described wanting to submit a statement but not being able to do so—for fear of exposure despite reassurances about confidentiality, and in hopes of avoiding dredging up painful memories, among other reasons. Nonetheless, these victims echoed many of the sentiments described in the impact statements provided to the Court, which are briefly detailed below.[4]

For those in Ottinger's community, the systematic nature of Ottinger's deception has been a particularly upsetting dimension of his crimes. As one parent noted in a victim impact statement, Ottinger made a "calculated decision to victimize young children and ultimately their families" repeatedly over the course of many years. He cultivated a career

---

[4] Identifying information has been omitted from the public version of this filing pursuant to the victims' requests and in accordance with the government's obligations under 18 U.S.C. § 3509(d).

in education, knowing full well that he was sexually attracted to the children for whom he was meant to care.

Another mother reflected upon how Ottinger targeted victims "based on his elementary school relationships," noting that Ottinger "did not hold a typical substitute teacher role":

> Instead, his position allowed him access to [the victims] over the course of several years of development and in various school settings. He witnessed friend dynamics in the classroom, during gym, and in all intimate school settings. Ottinger then preyed on these relationships and exploited [the victims]. He knew who had phones. He watched how they reacted to intimidating situations. He saw their faces after he wrote threatening messages to them online. Ottinger threatened their relationships.

> He threatened exposure of their vulnerabilities. He demanded boys use their friendships to avoid defamation and ultimately forced [a victim] to engage [another victim] in the assault. Together, they worked to manipulate their predator, all the time hiding their fear in silence.

She aptly described Ottinger's targeting of minor victims as "timed," "strategic," and "very personal," noting that her family—like many others—was unaware of Ottinger's crimes until the FBI visited their home. She further noted: "Ottinger's manipulation was overwhelming and complete.  He is a true and deliberate predator."  This mother also described Ottinger's conduct as "intimate, persistent, taunting, exploiting, calculated, and devious.  He practiced his trade over his lifetime and it is well learned."

A third mother described the nature of Ottinger's offense thusly:

> [T]he thing that I find the most disturbing and upsetting is the fact that he sought out my child. This wasn't just a random Internet interaction. He knows my child, he sought him out

8

personally, deceived him and extorted him without regard. Mitchell was someone who worked in our school district, he fell into the category of a trusted adult, and he used that trust, that privilege and his connections to children to harm them.

To a person, each responding victim has described feeling deep embarrassment and shame as a result of Ottinger's conduct. These feelings have proven isolating for the victims and their families—particularly those in Ottinger's community, who fear that their neighbors will learn what Ottinger did to them. As a result, Ottinger's crimes continue to harm the victims, inhibiting them from seeking social support at a particularly critical and vulnerable time in the healing process, especially for those in their adolescence. One mother noted that her son "can't connect with people," "blames himself for what was done to him," and feels deeply "ashamed." The only lifeline in the midst of this isolation—therapy—has also proven to be distressing to him. The mother described her son as "even more withdrawn than normal" on days he attends therapy, that he "won't speak usually in the morning," is "nervous" in anticipation all day before the appointment, and "just wants it to go away." The victim's mother acknowledges that therapy is important for the child's recovery, but describes it as feeling like "we have to rip the Band-Aid off over and over again." Another mother described having urged her son to attend therapy, but his shame has prevented him from doing so. Other parents reported concerns about even finding available options for therapy in their community without risking that their child's identity would be revealed.

This shame and social isolation has had a deeply deleterious impact on these children's lives. One victim's mother described her son as having lost confidence in

himself—in his own judgment and his ability to be a role model to younger children who look up to him.  He hates school and does not trust teachers anymore; he is afraid to be alone with a teacher.  For an outgoing child whose school and social life had always been positive, the change is marked and severe.

Another victim's mother reported that despite her son's demonstrated intelligence and prior success in school, he has begun to fail classes, and teachers regularly contact her to report that he is unable to concentrate or complete his work.  She noted, "School is no longer a safe place for my son, or for us to send him, no matter the school."  The child is socially withdrawn and exhibits disordered eating and antisocial behavior, including fighting and lying.  His mother describes him as "a changed soul," "no longer the light joking boy he once was."  Chillingly, she noted, "He has several times said, 'I want to die.'"  The mother forecasts a long future of anxiety about the ongoing harm Ottinger's conduct could have on her son: "Some day [sic] this could ruin his career, and more, as digital media surfaces.  This is a truly a nightmare that could resurface digitally at any time."

Ottinger's crime has also riven victims' families.  The damage Ottinger caused one victim and his family have prompted them to want to move out of the school district, but they are financially unable to do so.  Instead, they remain isolated—unable to talk to friends or family about it as their "son would be devastated if anyone found out."  Another mother described feeling "sad, angry, exhausted, concerned, confused, and a myriad of other feelings that I cannot put words to.  My heart is broken."  She described the aftermath of Ottinger's conduct as "tak[ing] a physical and emotional toll on a parent," and "has created

10

a household stress that can be agonizing," causing "many family fights. . . ." This mother also reported that dealing with the consequences of Ottinger's crimes on her family "is having devastating effects on our marriage." Ottinger's crimes have changed "the fabric of who we were . . . ."

Nor have Ottinger's adult victims been spared lingering damage. One adult victim whom Ottinger sextorted described feeling "an extreme amount of anxiety" and so "haunted" by Ottinger's threats of "exposure, humiliation, and perpetual harassment" that he "scour[ed] the internet to try and protect [his] privacy and reputation multiple times a day for over a year." These searches ultimately led him to discover the complaint against Ottinger on the internet, which prompted him to contact the FBI. This victim's "career in the public eye" compounded his concerns about the risks to his "reputation and image" as a result of Ottinger's crimes. This victim reflected upon the continued harm to himself as well as to Ottinger's child victims, noting:

> While I continue to feel immense anxiety and fear because of Mr. Ottinger, and rebuilding has taken quite a bit of work and therapy, I at least have the mental maturity to continue in a productive manor. After reading the complaint leveraged against Mr. Ottinger, I could not imagine going through this level of panic at just 14. It is my opinion that a sick person would exploit an individual as I was exploited, but a menace to society would do the same things to a child. Mr. Ottinger had countless victims, all of whom he extorted with no remorse or second thought. I hope that he is offered the same amount sympathy and understanding that he extended to those he preyed upon.

11

## II.    Analysis

United States requests that the Court impose a sentence of at least 460 months' imprisonment and lifetime supervision on Ottinger.  Well into his history of sextorting children, Ottinger pursued and obtained a position of trust caring for the very children he sought to victimize.  He capitalized upon that position to learn information about his victims to aid his commission of the crime.  He pitted children—including family members—against each other to coerce them and maximize their fear and humiliation.  Ottinger's crimes invaded the victims' homes and bedrooms—what should have been their safest private sanctuaries. As evident from the victims' own accounts, the effects of Ottinger's crimes are long-lasting and far-reaching.  Moreover, Ottinger did not limit himself to the immediate reach of his community, but pursued victims—both children and adults—via the internet, in Minnesota and beyond.  Ottinger's conduct clearly shows that no boy or man is safe from Ottinger.  The recommended sentence seeks to balance the clear needs for deterrence, just punishment, and the need to protect the public from Ottinger with his acceptance of responsibility, as further described below.

### a.   U.S. Sentencing Guideline Calculations

The Court employs the U.S. Sentencing Guidelines as "the starting point and the initial benchmark" in imposing its sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007).  The Court then must consider the factors enumerated in 18 U.S.C. § 3553(a), in determining whether the applicable guideline range provides for an appropriate sentence. *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009).  Where the Court finds that the Sentencing Guidelines adequately account for the offense and relevant

circumstances, it "shall impose a sentence of the kind, and within the range" prescribed. 18 U.S.C. § 3553(b)(2).

Although the PSR assesses some different guideline provisions than those contemplated in the plea agreement, it concurs with the parties' agreement that the applicable guideline range is capped by the statutory maximum term of imprisonment of 62 years' (744 months') imprisonment. (PSR ¶¶ 154-57). So while the Court has an obligation to calculate the applicable guideline range correctly, *Rosales-Mireles v. United States*, 138 S.Ct. 1897, 1904 (2018), there is no dispute over the total applicable guideline range in this case.

Nonetheless, the government notes its objections consistent with its stipulations in the plea agreement. Specifically, it bears mention that the PSR fails to assess an upward adjustment under USSG §2G2.1(b)(5) for the defendant being in the custody, care, or supervisory control of the minor victim. (E.g., PSR ¶ 40). The PSR appears to discount the appropriateness of the enhancement under this guideline because the offense conduct did not occur at school, and was "not a factor in [Victim 1's] persuasion, enticement, or coercion because [Victim 1] believed he was communicating with a teenaged girl." (PSR ¶ 40). However, it was precisely Ottinger's efforts to cultivate relationships with and thereby gain knowledge of the child victims he taught, not only as a substitute teacher but also in regular school-related programming outside of regular class hours. Ottinger used his position to identify and target his victims, and to obtain intimate knowledge of their lives in order to extort them more effectively. For example, on multiple occasions Ottinger sextorted siblings, using his knowledge of their relationship to pit them against each other.

13

(E.g., PSR ¶¶ 23-24).  Because Ottinger's position was integral to his ability to sextort the victims within his school district, the parties' agreement to apply USSG §2G2.1(b)(5) was appropriate.  Nonetheless, it appears the PSR has addressed this conduct in assessing a two-level increase under USSG §3B1.3 for abuse of a position of trust. (PSR ¶ 43).  Again, regardless, there is no material effect on the overall guideline range.

### b.   Recommended Terms and Sentencing Factors under 18 U.S.C. § 3553(a)

The United States is requesting that the Court impose a lengthy sentence—460 months' imprisonment and a lifetime term of supervision.  This request seeks to balance the clear danger Ottinger poses to children and adults, within his community and beyond, with his acceptance of responsibility and willingness to spare the victims further agony by proceeding via information in this case.

### i.  Aggravating Factors

Ottinger's manipulation here is beyond that of and more insidious than a typical online sextortionist.  Here, he cultivated relationships with children in his care to facilitate his manipulation of them.   That Ottinger focused his career on the kind of work that would maximize his access to his desired victims speaks volumes about the depths of his deliberateness and the danger he poses to children.  Ottinger knew he had a sexual interest in children before he went to college.  Knowing that, he focused his studies and work on becoming a teacher.  While working toward this career goal, he worked at an elementary school where he identified numerous victims.  Whether he was in his studies, at work, or at home, all the while he continued victimizing children.  In his role as an educator, Ottinger was a mandated reporter for child abuse.  Rather than protect these children, Ottinger

14

capitalized upon his access to and knowledge of children to exploit and denigrate them for his own pleasure.

Perhaps one of the most heartrending aspects of the impact of Ottinger's crimes is that it capitalized on victims' deep and exceedingly human desire for connection, with many of the victims—including adults—believing they were forging a meaningful romantic relationship with "Rachel" or "Taylor."  Ottinger preyed upon his victims' desire for connection to obtain intimate images of them, and then extorted them not only to obtain additional images, but also to humiliate them.  That Ottinger exploited children in this way at a crucial juncture in their lives—just as they were beginning to explore healthy romantic and sexual attachment to their peers—makes his conduct even more devastating to the victims, and quite likely to have lasting impacts.

His offense conduct reveals a wide range of victim ages.  His child pornography collection included depictions of sexual abuse of infants and toddlers.  Among the identified sextortion victims in his community were preteens—often the earliest ages of children permitted some measure of independent access to electronic devices—including sextortion that began with one child as young as 10 years old, and continued over a matter of years.  Ottinger also targeted multiple young men for sextortion and humiliation.  A sexual interest in a wide age range of male victims, particularly where it includes infants and toddlers, may be reflective of a high likelihood of recidivism and considerable danger to children.  *E.g.*, Przybylski, Roger "Chapter 5: Adult Sex Offender Recidivism" *Sex Offender Management Assessment and Planning Initiative*, U.S. Dep't of Justice Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking, (2017)

<https://smart.ojp.gov/somapi/chapter-5-adult-sex-offender-recidivism>;        Minnesota

Department of Corrections, *Sex Offender Recidivism in Minnesota*, (2007)

<https://mn.gov/doc/assets/04-07_Sex_Offender_Report-Recidivism_tcm1089-

272768.pdf>.  Targeting both known victims as well as strangers may likewise increase

the risk of recidivism. Minnesota Department of Corrections, *Sex Offender Recidivism in*

*Minnesota*,        (2007)        <https://mn.gov/doc/assets/04-07_Sex_Offender_Report-

Recidivism_tcm1089-272768.pdf>.

These factors alone would warrant a lengthy sentence.  Even more troubling is that

exercising his power to shame and frighten his victims appears to have been the true core

of Ottinger's pleasure.  This is evident in Ottinger's frequenting humiliation-focused fora

online, as well as his clear interest in emotionally tormenting his victims via online

communications, as when he pitted siblings against each other, threatening to tell one if the

other did not produce more child pornography and vice-versa.  That he most often did so

while impersonating a girl under the guise of encouraging mutual sexual self-exploration

adds another dimension to the psychological trauma inflicted upon his victims.  Sadism is

also apparent in his sexual interest in child pornography depicting truly extreme and

disturbing physical abuse of children, including the violent sexual abuse of one toddler boy

who screams throughout from the "Super Hero Boys" series.

Ottinger's victims and their families report deep, lasting, deleterious effects of

Ottinger's abuse.  Outgoing children have become withdrawn and are self-isolating from

friends and family.  High achievers find themselves struggling in school.  At least one

victim is exhibiting compulsive behaviors damaging to his physical well-being as outward

signs of roiling inward turmoil.  Some of the children have expressed an erroneous belief that they should have known that Ottinger was not who he claimed to be.  As a result, they carry enormous guilt and shame for failing to protect themselves and other children from his crimes.   While understandable, these feelings belie the deeper truth of Ottinger's conduct—he was careful, practiced, and highly skilled at tormenting children to get what he wanted while concealing his true self.  That Ottinger focused on children within his tight-knit community has compounded his victims' misery—trapping them in silence for fear of risking further embarrassment.  Indeed, multiple victims never told their families what they had suffered until the FBI came to their homes to investigate.

The revelation of Ottinger's crime and true identity has rocked his community,



Instead, he continued his conduct unabated for years thereafter.  Indeed, Ottinger's abuse occurred on a much greater scale

▓▓▓▓▓▓—both in number of victims and in temporal scope.  Moreover, his offense conduct is distinct in the centrality of the desire to humiliate his victims.

There are additional aggravating factors beyond Ottinger's offense conduct alone. Unlike many similarly situated defendants, Ottinger came from a loving, supportive, and stable home.  He has succeeded academically and professionally, and has few of the hallmarks of mental health or substance abuse issues of many defendants who come before the Court.

By his mid-twenties, Ottinger had already established a long history of seeking out children for sexual exploitation.  Under these circumstances, his relative youth is unquestionably an aggravating factor.  Research has consistently shown that a younger offender is significantly more likely to reoffend than an older one. *See* M. Boccaccini, D. Murrie, S. Hawes, A. Simpler & J. Johnson, *Predicting Recidivism With the Personality Assessment Inventory in a Sample of Sex Offenders Screened for Civil Commitment as Sexually Violent Predators*, 22 PSYCHOLOGICAL ASSESSMENT 142, 142-148 (2010); Karl Hanson & Kelly Morton-Bourgon, *The Characteristics of Persistent Sexual Offenders: A Meta-Analysis of Recidivism Studies*, 73 J. OF CONSULTING AND CLINICAL PSYCHOLOGY 1154, 1154-1163 (2005).

To the extent that Ottinger may seek to present his offense conduct as the product of deeply repressed homosexual desire, that would fly in the face of the substance of his offense conduct.  Ottinger's conduct focused on exploiting the vulnerabilities of numerous children, and he relished his control over and coercion of them.  Whatever the motivation,

Ottinger's conduct clearly demands a lengthy sentence to protect the public and deter his future crimes.

## ii.  Mitigating Factor

Nonetheless, the proposed sentence does constitute a considerable downward variance in recognition of Ottinger's willingness to spare the victims further suffering by pleading guilty prior to indictment.   Likewise, the pre-indictment resolution of charges allowed Ottinger to avail himself of a plea to a small subset of the available charges against him.  Accordingly, the government's recommendation factors in all bases for leniency that merit consideration in this case.

## iii.  Avoiding Unwarranted Sentencing Disparities

The recommended sentence would not create unwarranted sentencing disparities between Ottinger and similarly situated defendants.  Although the Court's concern on this score is directed at national disparities, *United States v. Pierre*, 870 F.3d 845, 850 (8th Cir. 2017) ("The statutory direction to avoid unwarranted disparities among defendants, 18 U.S.C. § 3553(a)(6), refers to national disparities"), the government notes two relatively recent cases from this District may be useful for the Court's consideration.  This Court imposed a sentence of 420 months' imprisonment and 30 years' supervised release in *United States v. Deling*, 0:19-CR-41 (WMW/BRT), in which the defendant had engaged in sextortion of dozens of minor girls online over approximately six months' time.  Both defendants had a common interest in child pornography depicting the violent sexual abuse of infants and toddlers.  Both defendants were young—though Deling only 19 at the time of much of his offense conduct, while Ottinger continued well into twenties. Deling's

offense conduct included threats not only to victims' reputations, but also to the physical well-being of the victims and their families and friends. Unlike Deling, Ottinger has not previously been convicted of similar conduct. Also unlike Ottinger, Deling attempted to withdraw his guilty plea and continued to contact a minor victim pending his sentencing. However, Ottinger held and capitalized a position of trust as an educator that Deling did not have. Deling targeted strangers, while Ottinger targeted both strangers and children he knew intimately from his community. Based on this position of trust, the length of Ottinger's criminal conduct, and his age relative to Deling's, Ottinger warrants a longer sentence than Deling.

Another recent sextortion case in this district supports the government's request here. In *United States v. Monson*, 21-CR-44 (SRN/DTS), the defendant catfished minor girls by impersonating a minor girl online. In that case, the Honorable Susan Richard Nelson sentenced the 39-year-old defendant to 400 months' imprisonment and lifetime supervised release. Monson's conduct spanned only approximately two years' time and just over a dozen victims, unlike Ottinger's near-decade of sextortion of dozens of victims. Unlike Ottinger, Monson's catfishing of minors involved compliments and enticement rather than threats of reputational harm and humiliation. Monson's catfishing victims ranged in age only from 12 to 17, though Monson also produced a surreptitious video of an eight-year-old girl in his care. Both defendants enjoyed extreme child pornography content, although unlike Ottinger, Monson did not exhibit an interest in depictions of the rape of infants and toddlers, but rather encouraged his victims to engage in bestiality. Although both defendants employed deception to victimize children, Monson did not hold

20

a position of trust that he exploited in order to further his manipulation of victims. Also unlike Ottinger, Monson suffered from a considerable substance abuse and mental health history that ultimately required his civil commitment. Monson recidivated after the FBI executed a search warrant on his residence, while Ottinger was arrested and detained at the time of the execution of the warrant. On balance, Ottinger's deliberate targeting of numerous children using his position of trust and employment of coercion and humiliation over a much longer period than Monson counsel for a longer sentence than Monson received. Additionally, Monson's history and characteristics warranted a shorter sentence than Ottinger's.

### c. Supervised Release

The United States requests that the Court impose a lifetime term of supervised release, as counseled by the U.S. Sentencing Guidelines. Ottinger poses a serious danger to children and is highly capable of deception. Someone so adept at manipulation will be exceedingly difficult to supervise, even assuming Ottinger harbors a sincere desire for rehabilitation. That his offenses occurred through online obfuscation further points to the need for intensive supervision with special conditions tailored to ferreting out impermissible internet activity. The extended duration of Ottinger's offense conduct further counsels for a lifetime term of supervision.

Additionally, the Court should impose special conditions tailored to Ottinger's offense. The Court has "wide discretion when imposing terms of supervised release within the statutory framework provided by Congress." *United States v. Fields*, 324 F.3d 1025, 1026-27 (8th Cir. 2003). Special conditions of supervised release are appropriate if

"reasonably related" to the applicable sentencing factors described in 18 U.S.C. §§ 3583(d)(1), 3553(a), and involve "no greater deprivation of liberty than is reasonably necessary" to achieve the purposes of supervision, 18 U.S.C. § 3582(d)(2).  In imposing such restrictions, the Court must make its findings "on an individualized basis . . . ." *United States v. Davis*, 452 F.3d 991, 995 (8th Cir. 2006).  The government requests that the Court make individualized findings in support of these conditions at sentencing based on Ottinger's specific characteristics. *United States v. Davis*, 452 F.3d 991, 995 (8th Cir. 2006).

Given the nature of the offense, the Court should require Ottinger to participate in sex offender treatment programming, and should restrict his access to electronic devices and the internet.  Additionally, the special conditions should restrict his access to minors and include an order not to contact any victims of the instant offenses and of the conduct to which he pleaded guilty in the plea agreement (which applies to unidentified and identified victims).

### d. Restitution

To date, the government has not received restitution requests from Ottinger's victims, although the undersigned has been in contact on multiple occasions with multiple victims' families, who have reported out-of-pocket costs related to counseling.  The

government will apprise the Court of any changed circumstances regarding restitution as soon as possible.

## III.    Conclusion

For the foregoing reasons, the United States requests that the Court impose a sentence of at least 460 months and a lifetime term of supervision to follow.

Dated: April 8, 2022                                    Respectfully Submitted,

                                                        ANDREW M. LUGER
                                                        United States Attorney

                                                        */s/ Miranda E. Dugi*
                                                        BY:  MIRANDA E. DUGI
                                                        Assistant U.S. Attorney
                                                        Attorney ID No. 5140546 (NY)

23